## Henrietta Raphael, Appellee, v. Chicago and West Towns Railways, Inc., Appellant.

### Gen. No. 39,406.

Opinion filed December 15, 1937.

Rehearing denied December 28, 1937.

BERTHOLD L. GOLDBERG, of Chicago, for appellant; IRWIN S. BASKES, of Chicago, of counsel.

ROYAL W. IRWIN, of Chicago, for appellee.

MR. JUSTICE HALL delivered the opinion of the court.

Defendant appeals from a judgment entered against it in the circuit court of Cook county for the sum of

$3,000 and costs, in an action brought by plaintiff against defendant by which she seeks to recover for a personal injury alleged to have been sustained through the negligence of the defendant. The complaint filed in the cause does not appear in the abstract.

Plaintiff's testimony is to the effect that on August 14, 1933, about 7:30 p. m., she became a passenger on a street car at Ridgeland avenue and 26th street in Berwyn, and that the car upon which she became a passenger, was northbound, and was then standing just south of the corner at the intersection of the streets named; that Ridgeland avenue runs north and south and 26th street runs east and west; that she got on the car by the front door, paid her fare to the motorman, that he then closed the door after her; that after entering the car vestibule, plaintiff walked forward and that as the car was making the turn around the corner from Ridgeland avenue into 26th street, it made a sudden lurch and threw her forward and off her feet, and that at this time, the car was "right in the middle of the curve"; that she had no idea of its speed, and that her fall was stopped by a rod which she fell over, and that this rod struck her on the right side above her breast; that she then walked into the car and took a seat and "had an awful pain," and that when she gets a cold, it settles in her chest and she has a hard time talking; that she had no doctor the night of the accident, but that she called on Dr. Ashworth the next day at his office; that her chest was discolored, and that the discoloration was of the size of a quarter or half dollar, about one inch, black and blue, and that it was swollen; that she saw Dr. Ashworth about a week after the first visit, and that she continued to have pains, but that at first she was not confined to bed; that thereafter she contracted a cold and went to bed, and was confined quite a while; that she weighed about 125 pounds before she was hurt, and that her weight dropped down

to about 103 pounds, and that she was confined to her bed for a few weeks after the accident; that before the accident, she did all her housework, but that after the accident, she was unable to do her work; that she continued to be treated by the doctor that winter; that Dr. Ashworth gave her heat treatments, and that she made about 35 visits to this doctor, including the calls he made to her home; that thereafter she was treated by a Dr. Penchina, but that she did not recall the number of times; that she made between 18 and 20 visits to a chiropractor and paid him $2.50 a visit; that Dr. Penchina gave her medicine and light treatments to the right side of her chest; that she "merely went to Dr. Penchina for his opinion as to what he thought was the trouble, because I could not get any relief from Dr. Ashworth"; that after taking these light treatments, she felt better; that about April 1, 1935, she went to California and was treated by a doctor out there, who gave her heat treatments and inoculated her against colds; that she stayed in California about a year and came back to Chicago in April, 1936, and that she still has pains in her chest. On cross-examination, plaintiff was asked if she spoke to the motorman about the accident at the time, and she stated she spoke to no one but a young lady who was in the car; that about two weeks after the accident, she wrote a letter to Mr. Collett of the defendant company; that in 1930 plaintiff had another accident for which she brought suit, but that the injuries she received and sued for at that time, are not identical.

Elsie Neboda, a witness for plaintiff, testified to the effect that she was riding on the street car at the time of plaintiff's alleged injury on August 14, 1933; that the motorman acted as conductor and sat on the front platform of the car; that the car came to a stop at Ridgeland avenue and 26th street, and that plaintiff

got on the car; that the witness was then sitting on the front seat of the car; that the car was standing still when plaintiff got on; that there were lights at the intersection and the lights were "Stop" at the time plaintiff got on, but that after plaintiff got through paying her fare the lights changed and that the car made a sudden jerk around the curve there; that after plaintiff paid her fare, the lights changed to "Go" and the car started off so all of a sudden, it just knocked plaintiff against the rail; that "the way it started off, it made that curve there, it went around so fast, I don't know—it was just around the curve there." This question was asked of the witness: "Q. Just before she [plaintiff] fell down, you said something, that the car did something, what did you see the car do or what did you feel it do, or what did the car do?" "A. It was sort of an unusual jerk, I don't know." A motion was made to strike this answer, but the motion was overruled. This witness testified further to the effect that the plaintiff was knocked against the rail, which is right behind the motorman, and is made of iron pipe, that the rail just about reached to the chest of the plaintiff; that the car gave a jerk and plaintiff fell over and her chest came in contact with the rail or pipe, and that plaintiff then walked into the car and sat next to the witness and held her hands to her chest and said: "Did you see the way it knocked me against the rail?" and the witness answered, "Yes," and that both the witness and plaintiff got off the car at 46th and 22nd streets. This witness further testified that plaintiff called on her a couple of weeks after that. On cross-examination the witness stated that at the time the plaintiff fell against the rod or bar, the car was just going around the curve, and was about half way around, and that there were six or seven other people on the car at the time.

Charles Sampson, the motorman in charge of the car at the time and place in question, was produced as a witness by both plaintiff and defendant. He stated certain facts as to the operation of his car at the time and place in question, and as to his experience as a motorman, and that passengers enter the front door at his right as he faced forward; that at the time in question, he was operating the car involved, but that he had no recollection of plaintiff getting on the car at the time and place in question, and that he had no recollection of having ever seen her before; that at the time and place in question, nobody spoke to him concerning any fall or bump, and that "there was no accident at all on my platform on that evening." He further stated that he had had occasion to start the car in question a great many times, and that at the time in question, the car was in good condition and that it did not jerk or spring forward any more than any other car, that "they all have a little jerk starting up, that is, when you give them the first point. No car will start away smoothly." On cross-examination, he testified to the effect that the curve in question is a sharp curve, and that "you daresn't go around that curve over two points," that "I know how we make that curve and I know what the required speed is in making that curve, and I make it a great number of times."

Dr. Wease L. Ashworth, the witness to whom plaintiff refers, stated that he first treated plaintiff in August, 1930, for a cyst on her lip, which he removed, and in July, 1931, he treated her for an infected foot; that on August 15, 1933, plaintiff came to the office of the witness and complained of an injury to her chest, and stated to the witness that she had fallen in the street car and bumped her rib, and indicated the place of the alleged injury; that at that time, there was a small swelling which was discolored, probably one inch

in diameter, and soft, and that she probably had a small hemorrhage underneath the skin, that the color was bluish-black, and that at that time, plaintiff complained of pains in the swelling; that plaintiff came to his office about a week after the first visit, and that the discoloration was practically gone, but that the swelling was still present; that the first time he saw plaintiff, he put some tape on her chest and gave her the usual treatment; that at the end of the week, she still complained of pains, and that at the end of two weeks thereafter, she called again and still had a small swelling at the place indicated, but that it was firm and hard, and that at that time, she made no other complaint of pain except as to the point indicated; that he advised the plaintiff to have an X-ray picture made, which she did, but that it did not show anything. Objection was made to the doctor's testifying as to what the X-ray showed, that the X-rays taken should be produced. The objections were overruled, and the witness continued and stated that X-ray pictures show only an opaque material, such as bone or calcium; that soft tissues such as blood vessels and the nerves and flesh do not show, because the light goes right through them, and that the picture he saw showed no injury to the bone; that the witness saw plaintiff again on October 2nd, following, at her home, and that she then had a cold in her chest; that she stated to the witness that the pain still persisted, and that there was a swelling at that time; that he made 23 visits to her home over a period extending from October to February, and that there was a change in her general condition at that time; that she lost about 20 pounds in weight and developed night sweats and temperature, which was intermittent; that he saw her again in August, 1934, with a physician from the street car company, and that at that examination she still had a small swelling over

the third rib, but that otherwise she was essentially negative, and that he never treated her again until April, 1936; that in March, 1935, she went to California on his advice, and that he treated her on May 25, 1936, after she had returned, and that at that time, she had a deep chest cold, congestion in the chest and quite a bit of expectoration of mucous and phlegm. He stated that he had no opinion as to what the congestion of the chest and the conditions to which he referred, resulted from; that at the time of the first examination, she weighed about 120 or 125 pounds, and that she lost 20 pounds in weight between the time he first saw her and the last time; that the defendant paid him for 11 calls at the rate of $2 per call. On cross-examination this witness stated that when he said that plaintiff had a small hematoma, he meant that she had a hemorrhage under the skin that developed into the form of a tumor, and he further testified that "it is not a bruise, it is a hemorrhage under the skin," and that "I could not see any bruises or wounds or lacerations of any other kind."

Dr. H. E. Jenkins, the physician who examined the plaintiff together with Dr. Ashworth, testified, in substance, that he was not employed by the defendant company, but that the defendant company called him twice or three times a month on cases; that on June 28, 1934, together with Dr. Ashworth, he called on plaintiff at her home, and together with Dr. Ashworth, examined her, and found no evidence of injury that she claimed to have received. On cross-examination, he testified to the effect that he found no evidence of swelling and no evidence of any injury of any kind to the ribs; that the plaintiff told the witness she had an aching pain, said nothing about her general physical condition, or that she had lost weight. He further stated that he could tell that she had lost weight by looking at her, and that

she was not in good physical condition, and that he found no evidence of any injury to her chest, or in front of her body.

From the testimony of the plaintiff and her occurrence witness, we can arrive at no other conclusion than that the accident to plaintiff, from which she received the alleged injury, occurred while the car was in the act of going around a curve, which both witnesses testified, was attended by a "lurch or jerk." Plaintiff testified that she had no opinion as to the speed of the car, and her witness says nothing on the subject. "Lurch" is defined by Standard Dictionary to mean "a sudden swing or rolling to one side, as of a ship; hence any irregular or loose swinging movement."

Defendant cites the case of *Beatty v. Metropolitan West Side El. R. Co.*, 141 Ill. App. 92. In that case the charge in the declaration was that the defendant suffered injury because defendant, "by its divers then servants, so suddenly and violently started or jerked forward the said train of cars on which the plaintiff was then and there a passenger, that notwithstanding the fact that she was a woman of great age and in the exercise of such care and caution, which could be reasonably required of her, Mary C. Beatty, the plaintiff herein, was, before she had time to gain a seat, with great violence, thrown or hurled to the floor over an obstruction in the aisle of defendant's said car." In that case plaintiff testified as follows: "I took about two steps and the car gave a very swift jerk and started me to fall; before I could catch myself, it gave another very heavy jerk, very heavy, and by that time it threw me and I fell across a suit case and hurt my right arm." Her daughter who accompanied her, testified that plaintiff was about one step inside the door when "the car gave a very sudden jerk, sort of halted, then very sudden, that threw her. I was looking in

the direction in which my mother was going. There was a very sudden jerk and then there was a sort of halt and then a still more sudden jerk that threw mother.'' The cause was submitted to a jury, which returned a verdict for defendant, and plaintiff appealed. The court affirmed the judgment of the trial court, and in its opinion, said: ''Whether in a particular case proof that an accident happened to a passenger will be of such legal value as to make out a *prima facie* case of negligence against the carrier, depends on whether the accident is of a kind which does not ordinarily occur if due care has been exercised. A *prima facie* case is made out and a presumption of negligence on the part of the carrier arises from proof that a passenger was injured by derailment, collision with a train, or an object on the track, the breaking of a wheel, an explosion, and many other causes. . . . All that was proved in this case was that the car jerked or lurched, and thereby the plaintiff was thrown down and injured. She was in the car next behind the motor car. The train could not be started without causing that car to jerk or lurch to some extent. It is quite possible that from only the ordinary and unavoidable jerking or lurching of a car caused by starting a train, a passenger might, without negligence on his part, lose his balance and fall. The question is not, whether the jury might from the evidence as to the jerking of the car, have found as a fact that the defendant negligently operated the train, but is, whether from the fact that the plaintiff, a passenger, without negligence on her part, lost her balance and fell, because of the jerking or lurching of the car, and was injured, the law presumes that the defendant negligently started the train. We think that under the evidence in this case the question whether the defendant was or was not guilty of negligence in starting the train, was a question of fact for the jury.''

In the instant case we are not prepared to say that the jury was not justified in finding that the defendant was guilty of the negligence charged.

Defendant contends that there is no causal connection between the alleged occurrence and plaintiff's alleged ailments.

In *Ivanhoe v. Buda Co.*, 247 Ill. App. 336, plaintiff claimed to have been operating under the provisions of the Illinois Workmen's Compensation Act, and that he was entitled to compensation under such Act for certain injuries received while in the employ of the Buda Company, resulting from an electric shock. It was the contention of defendant that the damages alleged to have been sustained were not supported by the evidence, for the reason that there was no medical testimony to the effect that plaintiff's alleged disability resulted from electric shock. In holding that there was not sufficient proof to sustain the claim, this court said:

"While it has been held that where it appears from the evidence that the plaintiff, in a personal injury case, was in good health before he was injured but in bad health afterwards, this may be sufficient to submit the case to the jury as to whether the disabilities complained of resulted from the injuries received (*Chicago Union Traction Co. v. May*, 221 Ill. 530; *Rehthaler v. Crane Co.*, 218 Ill. App. 267), yet we are of the opinion that in the instant case, where the evidence shows that a considerable period after plaintiff was injured he began to have fits and fainting spells, some expert evidence ought to be adduced on the question as to whether his condition resulted from the injury. *Rose v. Chicago City Ry. Co.*, 207 Ill. App. 345.''

In *Rose v. Chicago City Ry. Co.*, 207 Ill. App. 345, (Abstract Opinion) plaintiff claimed to have been injured while alighting from a car, by reason of which it was charged that her daughter, who was alighting

from the car at the same time, was thrown against plaintiff as a result of a "tremendous jerk" of the car. There, as here, the question arose as to whether certain physical conditions and disease from which plaintiff was alleged to have suffered, could properly be attributed to the accident. It was shown by the testimony that the plaintiff in that case had been injured before. In commenting upon the question as to what evidence should be produced in order to show a causal connection between the happening and the physical condition of the plaintiff, it was stated by this court that it was necessary for the trial court to receive opinions from physicians as to whether or not the alleged condition could be said to be a result of the injury complained of; that "of necessity laymen must be guided as to infections, their causes and progress by the opinion of experts; to leave these things to the guesses of the uninformed would make possible damages based solely on speculation and not upon evidence."

In the case at bar, while the evidence indicates that plaintiff received an injury which caused her considerable suffering, there is no evidence to sustain her claim that her colds, loss of weight and certain other conditions testified about, had any relationship to the injury received, through the alleged negligence of defendant. The attending physician definitely stated that he would not testify that such conditions did result from such injury. Under these circumstances, we are of the opinion that the verdict is excessive. If, within 10 days of the filing of this opinion, plaintiff will file a remittitur of $2,000, then it is ordered that judgment be entered here for $1,000 and costs of suit. Otherwise, the cause is reversed and remanded for a new trial.

*Judgment entered here for $1,000 upon filing of remittitur of $2,000, otherwise reversed and remanded for a new trial.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.